IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ROOSEVELT WILLIAMS,

                    Plaintiff,

          v.

SARA FRY and TRAVIS HAAG,

                    Defendants.

ORDER

15-cv-212-jdp

---

Plaintiff Roosevelt Williams, a prisoner at the Columbia Correctional Institution, brings claims that defendant prison officials violated his due process rights by confiscating his wedding ring and funds from his release account, and violated his Eighth Amendment rights by denying him a lower bunk restriction. Defendants have filed a motion for summary judgment, to which Williams responded by filing a series of motions alleging that prison officials engaged in various misconduct, including withholding disclosure of documents until Williams's summary judgment response deadline passed, and tampering with pieces of evidence. In a September 20, 2016 order, I denied his various motions for sanctions for the time being but gave him a chance to submit supplemental materials in opposition to the summary judgment motion and supporting his assertions that defendants tampered with evidence. Dkt. 76.

Williams has submitted supplemental materials and defendants have responded. After considering the parties' submissions, I see no reason to reconsider my previous rulings denying his motions for sanctions. I also conclude that defendants' motion for summary judgment should be granted on all of Williams's claims.

## A. Sanctions

In the September 20 order, I stated that Williams made two arguments about prison officials tampering with evidence:

- Ms. Pafford "deliberately and intentionally alter and purposely made different [a health service request] form Williams sent to [the Health Services Unit]," Dkt. 53, at 1, but he does not explain how the document was altered, and how it affects any of his claims in this lawsuit.

- prison official Kim Carl "tampered with evidence," and that she has opened some of his legal mail and prevented a copy of his interrogatories from reaching the court, Dkt. 67 but it is unclear whether he means that Carl has altered documents, or he is referring to Carl blocking the mailing of the interrogatories.

Dkt. 76, at 3-4. I instructed Williams that to prevail on renewed motions for sanctions he would have to "explain what he means by 'tampering' in detail, how he knows the evidence has been tampered with, what accurate copies of the evidence looked like before they was tampered with, and how his claims have been affected by this evidence." *Id*. at 4.

Williams now says that Pafford added her writing onto his copies of "authenticated HSU forms." He says that he has submitted two copies of a form—one with her writing and one without—but those documents do not seem to be included in his supplemental submissions, because there are no documents fitting his description. He does not identify the document with enough particularity to even guess at which document he is referring to. This does not address my concerns with his previous motions for sanctions.

Williams says that Carl intercepted a set of interrogatories he intended to send to the court in June 2016, presumably along with his summary judgment response, but he does not explain how he knew this intentional tampering happened, other than that she was working in the mail room when it allegedly disappeared. This speculation cannot be the basis for sanctions. He does not cite to these interrogatories in his proposed findings of fact or brief, so

it is unclear how the interrogatories would have made a difference in his litigation of the case. He later submitted a set of unanswered interrogatories dated October 12, 2016, Dkt. 78, but he does not explain whether these were a copy of what went missing earlier, or provide any other reason for submitting them. Because Williams falls far short of fulfilling my instructions for supporting his renewed motions for sanctions, I will deny his motions.

## B.  Summary Judgment

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex*, 477 U.S. at 322.

### 1.  Findings of fact

Plaintiff Roosevelt Williams is a state of Wisconsin prisoner incarcerated at the Columbia Correctional Institution (CCI), a maximum security institution located in Portage, Wisconsin. During the time relevant to this case, defendant Sara Fry was a corrections unit supervisor at CCI. While at CCI Fry was a member of the "Special Needs Committee," which meets weekly to consider inmate complaints and accommodation requests related to inmates' physical conditions. Defendant Travis Haag is a correctional sergeant at CCI.

### a. Ring and release account funds

Under Division of Adult Institutions policy 309.20.03, for security reasons, only inmates that can document they are married or widowed are permitted to wear a wedding ring. This rule is in place to limit the use of personal property as a status symbol or as currency in gambling within the prison.[1]

In July 2012, Williams was transferred from the Waupun Correctional Institution to the Oshkosh Correctional Institution. The property inventory form associated with that transfer showed that Williams possessed a wedding ring. Inventories from his November 19, 2013 transfer to the Dodge Correctional Institution and November 21, 2013 transfer to CCI had this field blank, although the state concedes that "[i]t is possible that the ring was on Williams's finger at the time the inventories were completed and not properly included on the Property Inventor(ies)." Dkt. 58, at 2. The CCI inventory also shows that a wedding ring was added to his list of possessions at some point.

Even though Williams had a wedding ring at CCI, he did not possess documentation (such as a marriage license) that he was authorized to possess it as of July 10, 2014. In July 2014, defendant Haag told Fry that Williams had a ring on but had no documentation that he was married. Fry "looked into this further and found no evidence that [Williams] was married." On July 10, Fry told Haag to confiscate the ring. Williams gave the ring to Haag.[2]

---

[1] Williams says that the officers did not take his word that he was married, because of his race, but he was not allowed leave to proceed on equal protection claims. Likewise, he contends that Fry retaliated against him for filing grievances, but he was not allowed leave to proceed on a retaliation theory.

[2] The parties dispute the exact location and officers present when Williams gave the ring to Haag, but the dispute is immaterial. Williams also says that Haag used a racial slur while telling him to hand over the ring, but again, he is not proceeding on equal protection claims. At best, his theory of racial discrimination suggests that defendants' decision violated due

Fry says that she told Williams that she would keep it in her desk pending receipt of his proof of marriage. Williams says that Fry never told her this.

Williams filed an inmate grievance stating that Fry and Haag took his ring without permission and threatened punishment if he did not comply with their orders. The inmate complaint examiner recommended dismissal because Williams did not have proof of his marriage. The inmate complaint examiner also recommended that staff follow up with Williams because under prison rules, his ring could be disposed of after 30 days if the prison did not receive proof of the marriage. The warden affirmed the dismissal of Williams's complaint and Williams appealed. On appeal, corrections complaint examiner Charles Facktor obtained a letter from the Dane County Register of Deeds office, which he accepted as sufficient proof of Williams's marriage. On August 12, 2014, he recommended affirming Williams's appeal with the modification that the ring should be returned and a copy of the letter be placed in Williams's social services file.

While this was happening, Williams was trying to get the documentation of marriage himself. On August 12, 2014, presumably before he received Facktor's ruling, Williams completed a form seeking disbursement of release account funds to pay for a copy his marriage certificate (Williams had no money in his regular account). Because of the importance of the wedding ring, Fry says that she requested special permission from the warden to use release account funds for this purpose.[3] Two days later, $20 were transferred to Williams's regular account, and a check for $20 was sent to the state office of vital records.

---

process because it was made in violation of prison rules. I address that argument below.

[3] Williams disputes that Fry made any attempt to help him, but he does not have personal knowledge of Fry's efforts.

5

On August 26, 2014, DOC secretary-designee Deirdre Morgan ruled on Williams's grievance appeal, stating the following:

> The attached Corrections Complaint Examiner's recommendation to AFFIRM WITH MODIFICATION this complaint is not accepted as the decision of the Secretary. My decision is to affirm this appeal.

Dkt. 42-2, at 7.[4]

Fry says that she gave the ring back to Williams when the corrections complaint examiner's recommendation was issued (by this time Haag did not work on Williams's unit, so he was not involved in the decision to return the ring). She does not say what day she returned the ring, but her declaration makes clear that it was before Morgan's ruling on August 26. Williams disputes Fry's version, saying that Fry did not give him his ring back when she claims to have. He cites to a "property receipt/disposition" form showing that he received the ring back on September 3, 2014. I will credit Williams's version.

On August 27, 2014, Williams submitted an "Interview/Information Request" form asking Lindsay Walker to stop payment on the check. I take it to be undisputed that this did not happen.

---

[4] This ruling is ambiguous—defendants argue that Morgan did not agree with Facktor's ultimate outcome, which was to give the ring back to Williams. This has support because Morgan said she did "not accept[]" that decision. But as discussed below, the institution complaint examiner handling Williams's next grievance seemed to interpret Morgan's ruling as being in favor of Williams—perhaps because it used the term "affirm," which in the ICRS setting is usually associated with a ruling in the prisoner's favor, *see* Wis. Admin. Code §§ 310.12 (the institution complaint examiner either dismisses or *affirms* a prisoner's complaint), and 310.15 ("The department shall implement an *affirmed* decision within 30 working days from the date of decision.") (emphasis added). Moreover, Morgan states that she affirmed "the appeal," which makes it sound like she agrees with the person appealing, as opposed to affirming the previous ruling to dismiss the complaint. I will resolve this ambiguity in Williams's favor and assume for purposes of this opinion that Morgan meant to give the ring back to plaintiff.

Williams filed another inmate grievance (dated August 28 and received September 2, 2014), alleging that Fry had failed to comply with instructions to return his ring. The institution complaint examiner recommended dismissing the new grievance because Wis. Admin. Code § DOC 310.15(1) allows staff 30 working days from an affirmed complaint to implement that decision, and this complaint was filed only six working days after Morgan issued her final order. The warden dismissed the complaint on September 12, 2014. Williams did not appeal this decision. Nor did Williams file a later grievance about the ring.

On September 19, 2014, Williams filed a third grievance, this one alleging that the business office violated policy by deducting $20 from his release account without the proper authorities' consent. Defendants say that this grievance was dismissed because Williams intended to use those funds to pay for a copy of his marriage certificate. That is not quite true. Williams's complaint was "affirmed with modification." The institution complaint examiner's decision, which was adopted by all subsequent reviewers, was that although marriage certificates were not an approved use of release account funds, and thus should not have been approved, Williams indeed asked for the disbursement and received a copy of the certificate.[5] The examiner concluded that under these circumstances, Williams should not be reimbursed, but that staff should be instructed about the proper use of release account funds.

b. **Special Needs Committee**

Williams suffers from lower back pain, in part caused by buckshot lodged in his back after being shot "years ago." On October 16, 2014, Williams submitted a health service request complaining of throbbing and aching discomfort in his back. He was scheduled to be

---

[5] The examiner also incorrectly stated that the certificate was used by Williams in prevailing on his earlier grievance, when the document actually used in that proceeding was the letter procured by Facktor.

seen in the Health Services Unit (HSU). The next day, Williams met with Nurse Campbell. In her notes Campbell stated that Williams ambulated to the HSU without difficulty, showed no distress, and was sitting in his chair comfortably with fluid movement.[6] Campbell counseled Williams to work through back stretches and exercises, use ice and topical pain rub as needed, continue with the pain medication, and decrease his weight.

On October 26, 2014, Williams submitted a health service request requesting a back brace, wondering why his request for a lower bunk restriction was not granted, and wanting to know when he was going to Madison for a colonoscopy. On October 31, 2014, Williams submitted another health service request requesting a back brace and wanting to know the status of his colonoscopy appointment. Williams filed inmate grievance no. CCI-2014-23168 on November 25, 2014, complaining he was not being treated for back pain issues.

The institution complaint examiner had Nurse Mashak review the medical record. Mashak stated that Williams's requests received prompt replies telling him that he was scheduled to see a doctor. The grievance was dismissed.

In early December 2014, Williams submitted a request to the Special Needs Committee seeking a low bunk restriction due to chronic low-back pain. DOC medical staff follow Health Services Policy 300:07, "Medical/Dental Restrictions/Special Needs" when inmates request special restrictions. Under this policy, requests for special needs and restrictions are addressed by a Special Needs Committee, including at least one staff member

---

[6] Williams disagrees with Campbell's assessment. He states that she did not see him "ambulate" to the meeting and that he was openly in pain. But because this case involves defendant Fry's interpretation of the medical notes, the relevant fact is what is contained in the notes.

from the Health Services Unit, two supervisory staff members, and the institution's Americans with Disability Act coordinator.

The Committee applies guidelines set forth in the policy and nursing protocols to determine whether medical restrictions or special needs should be authorized. During the Committee meetings, one of the Committee members would read the criteria for a specific restriction, and the HSU staff member would review the inmate's medical records. Under this policy, prescribing practitioners generally refer items to the Committee for review of special needs rather than write orders themselves for specific items. As seen below, some of the items can still be prescribed directly. The decision of the Committee cannot be appealed.

According to the guidelines in Appendix 1 of the policy, the Committee could approve low bunk restrictions for the following conditions:

- Acute injury: a temporary restriction that can be authorized directly by a nurse or prescriber.

- Significant functional limitations in mobility secondary to arthritis, musculoskeletal disorders or neurological disorders.[7]

---

[7] The list included in defendants' proposed findings of fact is incomplete. It omits "significant functional limitations in mobility secondary to arthritis, musculoskeletal disorders or neurological disorders," which is the condition most closely aligned with Williams's symptoms. *See* Dkt. 45, at 10-11. Williams points this out in his response, and defendants double down on their mistake by objecting to Williams's proposed finding as argumentative and conclusory. They are incorrect. If this were a closer case or I thought that defendant Fry and the Committee actually ignored this category, it could be grounds to deny their motion or even grant Williams summary judgment. But it is clear that the error originated in the declaration of Nurse Kristine DeYoung, a non-defendant, Dkt. 46, at 2-3 (whose citation to the policy is also to a non-existent exhibit number). The actual version of the policy provided by defendants and cited by Fry herself includes the missing category, so I will disregard the error in defendants' proposed findings and instead I will work with the policy as stated in the exhibits. There is no reason to think that Fry or the Committee used a version of the policy as stated by DeYoung. This means that I will disregard any fact proposed by DeYoung relying on this incorrect version, however. I expect all parties, but especially the state, to be accurate in their statements of the facts, particularly those facts on which the case might turn.

9

- Significant symptomatic cardiovascular disease.

- Obesity: a body mass index of greater than 40, and significant mobility issues.

- Older than 65.

- Post-operative: a temporary restriction that can be authorized directly by a nurse or prescriber.

- A current seizure diagnosis.

- Pregnancy at 20 weeks and later.

- Blindness.

Dkt. 44-1, at 9.

Williams was seen in HSU for a "Special Needs Committee evaluation" on December 10, 2014. Nurse Whalen reported that Williams attended recreation two times a week, participating in weightlifting and bike riding, and also performed weekly back exercises. His gait was straight, his range of motion was good, and he could sit and stand without difficulty.

On December 11, 2014, the Committee (including Fry, Nurse Thorne, ADA Coordinator Schmidt, and Captain Morgan) met to discuss Williams's request for a low bunk restriction. After consulting the policy and considering the criteria for a low bunk restriction, the Committee denied the request. The Committee sent Williams a memorandum stating, "You do not meet the medical criteria for this restriction."

Williams received further examinations, including a March 2015 appointment with Dr. Syed in which he told Williams that he did not meet any of the criteria for a low bunk restriction, and a March 2015 x-ray showing an intact lumbar spine. He was issued a back brace in August 2015. In September 2015, the Committee denied another request by Williams for a lower bunk. In May 2016, the Committee again denied him the restriction (Williams does not explain if Fry was on that Committee). But later in May 2016, a

"Prescriber's Order" granted Williams a bottom bunk restriction for one year. I take this to have come from a medical doctor.

### 2. Analysis

#### a. Due process

The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. To prevail on a § 1983 procedural due process claim, a plaintiff must demonstrate that he: (1) has a cognizable property interest; (2) has suffered a deprivation of that interest; and (3) was denied due process. *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010).

There are three aspects to Williams's due process claims: (1) defendants Fry and Haag took Williams's wedding ring; (2) Fry kept the ring even after a ruling stating to give it back; and (3) Fry told the business office to deduct funds from Williams's release account without proper authorization.

It is undisputed that Williams has a protected property interest in his wedding ring and the money in his trust fund accounts. It is also undisputed that Fry and Haag confiscated Williams's ring. Defendants shift between arguing that they should be granted summary judgment because (1) it was proper for them to confiscate the ring; and (2) and that their actions were "random and unauthorized" such that predeprivation process was unavailable under *Parratt v. Taylor*, 451 U.S. 527, 541 (1981), and *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). The analysis is somewhat complicated by the ambiguous ruling of the secretary-designee. It is unclear whether she meant to say that defendants properly followed the DOC's

jewelry policy, or that they violated the policy. Defendants' actions were not random and unauthorized if they followed the prison's policy.

But Williams's claim fails either way. From my review of the DOC's policy on possession of jewelry, it looks like defendants properly confiscated Williams's ring. As harsh as it seems, Williams did not have documentation that he was married or widowed. Williams does not contend that the state's policy of restricting the possession of rings is unconstitutional, and "the due process rights of prisoners are not absolute, but must be accommodated to the legitimate security needs of a corrections institution." *Caldwell v. Miller*, 790 F.2d 589, 609 (7th Cir. 1986).

Williams instead contends that he indeed had proof of marriage: the 2012 property inventory sheet. But that shows only that he possessed a wedding ring in 2012, not that he was authorized to wear it then, or that he was still authorized to wear it in 2014. And the more recent property inventories did not include a wedding ring.

If one assumes that the secretary-designee ruled that Williams *should* be allowed to have the ring, the most reasonable interpretation of the rationale for that ruling is not that defendants violated the policy. Rather, it is that defendants properly confiscated the ring but that Williams's lack of proof of marriage was rectified by the correction complaint examiner's acquisition of proof of marriage. Under this interpretation, the system worked: Williams received his ring, but only after the deficiency of proof-of-marriage was rectified.

But if the secretary-designee meant to say that defendants violated the policy by confiscating the ring, that means the confiscation was random and unauthorized. Courts have consistently held that due process claims for that type of a deprivation of a prisoner's property fail where the plaintiff has adequate postdeprivation remedies. *See, e.g., Munson v.*

12

*Gaetz*, 673 F.3d 630, 638 (7th Cir. 2012) ("Munson's complaint also makes it clear that he received all the process he was due in the form of a written notice explaining why he couldn't possess the books and a meaningful chance to be heard by a series of prison officials."); *Stewart v. McGinnis*, 5 F.3d 1031, 1036-37 (7th Cir. 1993) (due process requires "a meaningful opportunity to be heard on" whether an item is contraband); *see also Tyler v. Wick*, No. 14-CV-68-jdp, 2016 WL 5496631, at *6 (W.D. Wis. Sept. 29, 2016) (civil detainee had adequate postdeprivation remedies to challenge loss of property and money), *aff'd*, No. 16-3792, 2017 WL 951593 (7th Cir. Mar. 8, 2017).

And even beyond the administrative grievance process, Williams had or perhaps still has meaningful postdeprivation remedies. *See, e.g.*, Wis. Stat. §§ 893.35 (action to recover personal property after wrongful taking, conversion, or wrongful detention), and 893.51 (action for damages resulting from wrongful taking, conversion, or wrongful detention of personal property); *cf. Hamlin v. Vaudenberg*, 95 F.3d 580, 585 (7th Cir. 1996) (inmate complaint review system, certiorari review under Wisconsin law, and Wisconsin tort remedies against prison officials are adequate remedies for deprivation of good-time credits). Therefore, I will grant defendants' motion for summary judgment on the claim regarding the initial confiscation of the ring.

Defendant Fry raises a threshold argument with regard her refusal to comply with the secretary-designee's decision: she contends that Williams failed to exhaust his administrative remedies, because his grievance about her refusal to return the ring was dismissed as premature, and then he never filed another grievance about the issue. Pursuant to 42 U.S.C. § 1997e(a), no action shall be brought with respect to prison conditions by a prisoner confined in any jail, prison or other correctional facility until available administrative

13

remedies are exhausted. Prisoners must file their complaints and appeals in the place and at the time the prison's administrative rules require. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002).

It is perhaps understandable that Williams did not try again once the 30-day window for Fry to comply with the secretary-designee's ruling had passed, because he had gotten relief by then. But exhaustion under the PLRA is necessary even if the prisoner is requesting relief that the relevant administrative review board has no power to grant, *Porter v. Nussle*, 534 U.S. 516, 532 (2002), or if the prisoner believes that exhaustion is futile, *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). There are reasons to exhaust even when a particular kind of relief is not open to a prisoner: the Supreme Court has stated, "In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. . . . And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy." *Porter*, 534 U.S. at 525.

I will dismiss this claim without prejudice for Williams's failure to exhaust it. *Ford v. Johnson*, 362 F.3d 395, 401 (7th Cir. 2004) (dismissal for failure to exhaust is always without prejudice). He can refile the claim if he can successfully exhaust it, but he will likely find it impossible to file a proper grievance because those events happened so long ago.

The final deprivation was defendant Fry's deduction of funds from Williams's release account without proper authorization. This claim almost fails at the outset because Fry argues that Williams approved the release of funds himself. If all Williams was arguing was that Fry let him take money out of his release account in contravention of state release-account regulations, I would dismiss the claim because Williams would not have shown that

14

he was deprived of a property interest. Instead, he would have shown that he got to use his funds for the purpose he wanted.

But Williams suggests that Fry coerced him into spending the $20 on a marriage certificate by taking his ring and telling him that it would be disposed of unless he produced proof of marriage. However, this claim rises and falls with his first claim about Fry and Haag taking the ring. If defendants were properly applying the jewelry regulation, then it was Williams's choice to either produce proof of marriage or get rid of the ring. If defendants violated the jewelry regulation, Williams had postdeprivation remedies available to rectify the problem. For instance, he could theoretically file a certiorari or tort claim about the loss of his $20, although his odds of recovery seem scant given that he actually received the item he paid for. I will grant summary judgment to defendants on this claim.

### b. Eighth Amendment

Williams brings a claim that defendant Fry, as a member of the Special Needs Committee, violated his Eighth Amendment rights by denying him a lower bunk restriction in December 2014.

The Eighth Amendment prohibits prison officials from acting with deliberate indifference to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584-85 (7th Cir. 2006). To be considered "deliberately indifferent," an official must know of and disregard "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn

15

that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996).

Williams suffers from chronic back pain. He still has shotgun pellets lodged in his back after being shot in the back "years ago." It is unclear whether the shotgun blast is the only cause of his pain. He states that on the outside he received social security disability benefits. Williams's medical records show a long history of treatment for back pain. Defendants do not appear to be disputing whether Williams had a serious medical need. There is more than enough in this record to conclude that he does.

As for the deliberate indifference prong, it is somewhat unusual type of claim. Most prison Eighth Amendment medical care claims are against medical professionals for failing to properly treat a problem, or against non-medical professionals for failing to obtain medical assistance in a timely fashion. But here, Fry, who is not a medical professional, was part of a deliberative body making decisions about accommodations related to medical needs. From statements made in the Special Needs Committee policy, I can infer that DOC officials created the policy at least in part because they believed that medical professionals overprescribed accommodations in the past and they decided that doctors and nurses alone should not be the sole decision makers on requests for accommodations. *See* "Medical/Dental Restrictions/Special Needs" policy, Dkt. 44-1, at 2-3. ("Prescribing practitioners shall refer items to the committee/nurse for review of special needs rather than write orders for specific items."; "The security level and physical environment of the facility must be considered when authorizing special needs/restrictions. Alternatives shall be considered"; "Comfort Items shall not be approved by HSU. The most common incorrect assumption about such items is that they are medically necessary for proper medical care. This is not the case for the vast majority

of medical conditions. Requests for these types of items are not medical issues. HSU staff is encouraged to allow only those treatment items which have been scientifically shown to provide solid medical benefit, and to treat significant medical conditions.").

It makes a certain amount of sense to have security staff involved in decisions that affect cell assignments, the objects allowed in cells, and the like. But the injection of non-medical professionals into the treatment of medical problems opens those officials up to Eighth Amendment liability.[8] Fry could be liable under the Eighth Amendment if she took part in countermanding recommendations by medical professionals (including those on the Committee), ignoring the rules for how they were supposed to make decisions, or blindly following a policy that clearly harmed prisoners. But here, it is clear from the medical record that no reasonable jury could conclude that she and the rest of the Committee acted with deliberate indifference.

The Committee concluded that Williams did not have one of the medical conditions listed in the "Lower Bunk" section of the guidelines for determining special accommodations. The only category that could arguably apply to Williams is "Significant functional limitations in mobility secondary to arthritis, musculoskeletal disorders, or neurological disorders."[9] But

---

[8] Eighth Amendment claims against non-medical staff are often dismissed because non-medical officials are generally allowed to *defer* to the recommendations of medical professionals. *See, e.g.*, *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("As . . . a host of . . . cases make clear, the law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so.").

[9] Williams alternately describes his back pain as "chronic" and "acute," but it is clear that he is saying that he has suffered from bouts of sharp pain for a long time—he had a chronic condition. So there is no reason for the Committee to have considered Williams under the "Acute injury (temporary restriction of 6 weeks or less)" category.

the nurses examining Williams before the Committee's determination clearly thought that he did not have significant mobility problems.

In October 2014, Nurse Campbell stated that Williams walked to the HSU without difficulty, showed no distress, and sat in his chair comfortably with "fluid movement." At his December 2014 examination in preparation for the Special Needs Committee, Nurse Whalen stated that Williams's gait was straight, he had good range of motion, and he could sit and stand without difficulty. Neither Campbell nor Whalen recommended a low bunk for Williams. Instead, they explained other ways Williams could cope with pain: using medication, ice, pain rub, and performing stretches and exercises.

Williams disputes Campbell's and Whalen's reports, says that he is "challenging [the] special needs committee's medical care system as a whole," and points to events far predating the Committee's decision (he says that at some point he received Social Security disability benefits for his back) and postdating the decision (he eventually received a back brace in August 2015 and low bunk restriction in May 2016). But he is not proceeding on claims against Campbell, Whalen, or the officials who created or maintain the Special Needs Committee policy. He brought this Eighth Amendment claim against Fry.

And Fry and the Committee were entitled to make their decision on the medical record before it. That record showed that in the months immediately preceding the December 2014 decision, the medical professionals examining Williams clearly did not think that Williams had "significant functional limitations in mobility." They said his gait was straight, his range of motion was good, he could sit and stand without difficulty, and they noted that he regularly exercised by lifting weights and riding a bike. Given these facts, no reasonable jury could conclude that the Committee acted with deliberate indifference by

18

denying the lower bunk restriction. All the later decisions by other medical professionals giving Williams a back brace and lower bunk do is create a disagreement between medical professionals about the scope of Williams's problems, which is not enough to show deliberate indifference. *See, e.g., Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation."). Some later change in treatment does not retroactively make earlier treatment decisions unconstitutional.

Williams also suggests that Fry had a conflict of interest or personal animus toward him (as evidenced by the ring incident), or that prison official in general meant to retaliate against him or discriminate against him, but he does not support any of these theories with anything other than his speculation that Fry (and the Committee) based the decision on something other than the medical records. He argues that his medical problem is so obvious that a layperson would know he needs a low bunk restriction. I take him to mean that because the problem was so obvious, Fry must have based her decision on an impermissible rationale. But that is simply not borne out by the record: no reasonable jury could think this is the case given the results of the medical examinations Williams had immediately preceding the Committee's determination, which showed that he did not have problems with mobility.

Finally, Williams points to his gout diagnosis as another reason for the restriction, but none of the complaints or requests he filed leading up to the Committee's decision refer to that malady, so no reasonable jury could conclude that the Committee was deliberately indifferent by failing to give him the restriction based on that problem.

Because no reasonable jury could conclude that Fry and the Committee acted with deliberate indifference in denying Williams's request for a low bunk restriction, I will grant defendant Fry summary judgment on this claim.

### ORDER

IT IS ORDERED that:

1. Plaintiff Roosevelt Williams's renewed motions for sanctions, Dkt. 53 and 67, are DENIED.

2. Defendants' motion for summary judgment, Dkt. 40, is GRANTED.

3. The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered March 30, 2017.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

20